IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **FRANKLIN WOODS,** : | |
| : | |
| **Plaintiff,** : | Case No.: 22-cv-4420 |
| : | |
| v. : | Judge Algenon L. Marbley |
| : | |
| **ARAMARK CORRECTIONAL** : | Magistrate Judge Elizabeth P. Deavers |
| **SERVICES, et al.,** : | |
| : | |
| **Defendants.** : | |

### **OPINION & ORDER**

### I. BACKGROUND

This case comes before this Court on Plaintiff Franklin Woods' ("Plaintiff") Motion to Alter Judgment. For the reasons set forth below, Plaintiff's Motion to Alter Judgment as to his First Amendment Retaliation Claim as it pertains to Defendant Lt. Tatman, and his Equal Protection Claim is **GRANTED**. Plaintiff's Motion to Alter Judgment as to all other claims is **DENIED**.

This case primarily involves alleged claims that an Aramark employee and other correctional officers intentionally served, or failed to prevent the serving of, food out of a trash can to Plaintiff and other inmates on November 27, 2021. The facts of this case are set forth at length in the Court's March 14, 2025, Opinion & Order (ECF No. 111) adopting the Magistrate Judge's Report and Recommendation ("R&R") (ECF No. 102), recommending that this Court grant the motions for judgment on the pleadings and the motion to dismiss (ECF Nos. 43, 83, 90). In the interest of judicial economy, this Court will limit discussion to background that is pertinent to Plaintiff's Motion to Alter Judgment.

The Amended Complaint includes various allegations that Defendants tried to cover-up the incident and retaliated against inmates who sought medical attention or filed grievances. Plaintiff alleges that correctional officers informed Plaintiff that two inmate food workers—inmates Edward Smith and Richard Burton—alerted a lieutenant and officer that Ms. Woods, an Aramark Correctional Services LLC Food Manager, had retrieved beans from a "contaminated trash can," and had them placed on trays to be served. (ECF No. 31 ¶ 48). Plaintiff also alleges that medical staff provided a list to prison staff of all inmates who requested medical attention. (*Id.* ¶ 62). The morning before inmates were escorted for medical attention, Defendant Lt. Tim Tatman—sent by Defendant Captain Agee—allegedly screamed at the inmates who reported symptoms, noting that he had seen their medical complaints and stating that "I'm locking the entire Unit down, because we fired the bitch what else do you want us to do? . . . You[']r[e] sick so what . . . sleep it the fuck off." (*Id.* ¶ 65). Plaintiff claims this was to intimidate inmates from seeking medical attention or further reporting their symptoms. Moreover, it is alleged that Lt. Tatman threatened that he would make their lives living hell if his "staff gets in trouble over that Aramark bitch" and presented them with a choice to go to medical or remain locked down. (*Id.* ¶ 66). Plaintiff also alleges that between November 27, 2021, until December 10, 2021, he was so sick he could not leave his bed, but that Defendants Epperson and Farmer disregarded his requests to see the medical staff. (*Id.* ¶ 76).

Plaintiff alleges that Defendants placed them on lock-down "to prevent plaintiff and the other inmates from exposing that they were fed contaminated food by Aramark" and in retaliation for filing informal complaints and for seeking medical attention in connection with the allegedly contaminated food. (*Id.* ¶¶ 113, 118). Further, Plaintiff alleges Defendant, Tim Barttrum, had personal involvement due to his review and signing off on Aramark policies. (ECF

2

No. 113 at 2–3). On April 11, 2025, Plaintiff filed a Motion to Alter Judgment. The matter has been fully briefed and is therefore ripe for review.

## II. STANDARD OF REVIEW

Fed. R. Civ. P. 59(e) permits parties to move for a court to alter or amend a previously issued judgment. The Court will only grant relief under Rule 59(e) to correct one of the following: (1) a clear error of law; (2) newly discovered evidence not previously available to the parties; (3) an intervening change in law; or (4) manifest injustice. *Ogden v. Fortress Grp. USA*, 550 F. App'x 283, 284 (6th Cir. 2014) (citing *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 496 (6th Cir. 2006)). District courts have considerable discretion in deciding whether to grant motions filed under Fed. R. Civ. P. 59 and circuit courts review decisions for abuse of discretion. *Clark v. United States*, 764 F.3d 653, 661 (6th Cir. 2014).

## III. LAW AND ANALYSIS

Plaintiff requests that this Court: (1) amend the judgment dismissing claims against Aramark President, Tim Barttrum; (2) amend the judgment dismissing claims against Aramark employee, Ms. Woods; and (3) amend the judgment dismissing claims against ODRC Defendants. (*See generally* ECF No. 113). Defendants contend that Plaintiff is not entitled to an amended judgment because Plaintiff did not sufficiently point to a need to prevent manifest injustice. (*See generally* ECF Nos. 114; 115).

### A. Dismissal of Claims Against Tim Barttrum

Plaintiff argues that Defendant, Tim Barttrum, in his role as Aramark President, should be held liable for maintaining a custom or practice that allows employees to serve food removed from a trash can. (ECF No. 113 at 2–3). Plaintiff now asserts this Court failed to recognize that Plaintiff demonstrated Barttrum's direct involvement in the incident, as he "reviews and signs off

3

on" the policies and contracts that Aramark employees follow. (*Id.* at 3). Plaintiff, however, failed to allege with sufficient particularity any such conduct in the Second Amended Complaint.

Plaintiff also asserts this Court failed to consider that Aramark maintains a policy that incentivizes employees based on analytics data such as food product and utensil purchases that put pressure on employees to serve food at any cost, even if it means jeopardizing the safety of inmates. (*Id.*). Specifically, in the Second Amended Complaint, Plaintiff alleges that Aramark has policies that give managers bonuses for money saving, and, as a result, Aramark employees do not provide adequate food to inmates, nor do they comply with proper sanitation. (ECF No. 31 ¶¶ 142–143). He further asserts that such policies were a "moving force" behind the alleged deprivation. For additional support, Plaintiff cites to other documented incidents of Aramark employees serving food out of the trash to inmates in Michigan. (*Id.* ¶¶ 137–140). Ultimately, however, Plaintiff fails to allege that the personal involvement of any policymaker, namely Barttrum, caused his injury. Absent specific allegations in the complaint of Barttrum or another policymaker making deliberate choices regarding these policies, Plaintiff fails to state a claim. *See Grinter v. Knight*, 532 F.3d 567, 575 (6th Cir. 2008) (quoting *Miller v. Calhoun*, 408 F.3d 803, 817 n.3 (6th Cir. 2005)). Additionally, Plaintiff failed to demonstrate that there were other instances of similar conduct from Aramark that amounted to a widespread policy or custom. *See Leach v. Sheriff of Shelby Cnty.*, 891 F.2d 1241, 1248 (6th Cir. 1989); *Wallace v. Coffee Cnty.*, 852 Fed. App'x. 871, 876 (6th Cir. 2021).

Plaintiff's Motion to Alter Judgment as it pertains to Barttrum's Motion to Dismiss is **DENIED**.

B. Dismissal of Claims Against Ms. Woods

Plaintiff asserts that this Court should alter its judgment dismissing Aramark employee, Ms. Woods, as she did not move the court for relief herself. (ECF No. 113 at 3). This argument fails because this Court is entitled to *sua sponte* review of a case prior to entry of a final judgment. *Bloodworth v. Timmerman-Cooper*, 2012 WL 604236, at *2 (S.D. Ohio Feb. 23, 2012) (quoting *Mallory v. Eyrich,* 922 F.2d 1273, 1282 (6th Cir. 1991)). Plaintiff also contests this Court's adoption of the R&R finding that Plaintiff fails to make explicit factual assertions that Ms. Woods knowingly acted with a disregard for an excessive risk to inmate health or safety. Plaintiff asserts this Court failed to consider submitted video evidence of Ms. Wood purposefully removing food from the trash can and placing them on trays to be served. (ECF No. 113 at 22.)

Upon re-evaluation of cases relied upon in the R&R and this Court's Opinion & Order (ECF No. 111), this Court finds those cases distinguishable from this case. (ECF Nos. 102 at 14–17; 111 at 9–12). To survive dismissal, a Plaintiff proceeding under an Eighth Amendment conditions of confinement claim, must sufficiently allege that the Defendant acted in a manner that created **substantial risk of serious harm** under the objective prong, and further that the Defendant acted with a **knowing disregard** as required under the subjective prong. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (emphasis added). In the R&R adopted by this Court, the Court found that Plaintiff failed to satisfy the objective prong because "isolated instances of food poisoning are not sufficiently serious to constitute an Eighth Amendment violation." (ECF Nos. 102 at 15; 111 at 11–12). The R&R cites numerous cases supporting this assertion; all cited cases, however, contain instances of spoiled food, foreign objects present in the food, or insects present in the food. (ECF No. 102 at 15-16). Each of those instances can be characterized as

5

occurrences out of the control of staff or the result of "unpleasant" prison conditions that make up the "routine discomfort" inmates may face for their offenses against society. *Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1575 (11th Cir. 1985); *Clark v. Junck*, 2023 WL 4861751, at *3 (W.D. Mich. July 31, 2023) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)).

Alternatively, in this case, the alleged misconduct is not the result of some aspect that is inherent or expected in the prison context. Rather, it was a deliberate and intentional act that did not occur by happenstance or without the requisite knowledge that harm may result. Moreover, this Court cannot ignore that this incident was not the result of poor food quality or an incidental lack of sanitation.

*Mitchell v. Beshear*, as cited by Plaintiff, supports this Court's distinction between cases involving unintentional or negligent acts and intentional acts. (ECF No. 107 at 7–8 (citing *Mitchell v. Beshear*, 2011 WL 1458309 (W.D. Ky. Apr. 15, 2011))). In *Mitchell*, an officer was told that food being served to inmates contained feces, and the officer thought the comment was figurative on the food quality, so she did not act on the information until later, when she and other officials inspected the food and stopped its service to the prisoners. *Mitchell*, 2011 WL 1458309, at *3. The court noted that "the prior cases reviewing instances of food poisoning or foreign substances have always been based on **negligence**." *Id.* at *3 (emphasis added). As such, after determining that the "officials were not aware of the alleged contamination," the court in *Mitchell* adhered to the standard in which, "a single incident of food poisoning as a result of prison **negligence** does not create a constitutional claim." *Id.* at *3–4 (emphasis added). This suggests that cases based on intentional acts, not negligence, may avoid the standard referenced in *Mitchell* and the R&R, in which the singularity of food spoilage, poisoning, or the presence of foreign objects precludes a plaintiff from satisfying the objective prong.

6

Additionally, the *Mitchell* court noted that *"intentionally tampering with an inmate's food might allow a plaintiff to demonstrate **knowing disregard despite a one-time occurrence***." *Id.* (emphasis added). Thus, intentional tampering may allow a plaintiff to meet the subjective prong.

In the March 14, 2025, Opinion & Order, this Court considered *Mitchell*, but only in the context of the ODRC Defendants who did not participate in the tampering of Plaintiff's food. (ECF No. 111 at 11–12). Upon further review, while this Court expands on its analysis of *Mitchell* as it pertains to Ms. Woods, Plaintiff's claim still does not satisfy the objective prong. Here, unlike the bystander officer in *Mitchell*, Ms. Woods was the actor who deliberately caused contaminated food to be served to Plaintiff. She possessed the requisite knowledge and disregarded a risk to Plaintiff's health by serving Plaintiff food from the trash can. Further, this Court does not declare that the singularity of this incident precludes Plaintiff's claims. Notably, however, Plaintiff did not suffer a significant injury from Ms. Woods' conduct. Accordingly, this Court does not find that such claims arise to the sufficiently serious standard under the objective prong. *Correa v. Cullum*, 2018 WL 2020615, *4 (S.D. Ohio May 1, 2018) ("[T]he provision of the occasional disgusting, inedible, or unsanitary meal—even one that results in food poisoning—does not satisfy the "objective" component of an Eighth Amendment claim, ***particularly where no significant injury resulted.***"(emphasis added)). Thus, although this Court agrees that Ms. Wood's *intentional* conduct overcomes the single incident standard, as this was not the result of "prison negligence," Plaintiff's food poisoning did not result in a significant injury so as to satisfy the objective prong. Plaintiff's Motion to Alter Judgment as it pertains to Ms. Woods is **DENIED**.

7

C. Dismissal of Claims Against ODRC Defendants

1. *Eighth Amendment Claim – Serving Contaminated Food*

Plaintiff asserts that this Court should alter its judgment dismissing the ODRC Defendants, as this Court failed to consider the totality of the circumstances when assessing whether Plaintiff adequately pled the objective component. (ECF No. 113 at 4). Plaintiff also argues that the ODRC Defendants are liable under accomplice liability for aiding and abetting the actions of Ms. Woods. (ECF No. 113 at 4–5). Lastly, Plaintiff asserts this Court failed to recognize that Plaintiff pled that ODRC employees were directly involved in the intentional food tampering. (*Id.* at 6).

This Court holds to its prior conclusion that alleging knowledge that the food was in the trash can, without alleging anything further to show a risk was consciously disregarded, does no more than create suspicion of a cause of action. (ECF No. 111 at 11–12). Plaintiff's allegations are only that Defendants Sandridge and Sedlitz "were aware" that food had been removed from a trash can and they still allowed Plaintiff to eat the contaminated food. (ECF No. 16, ¶ 48). Plaintiff pled a conclusory allegation without any facts suggesting that Defendants Sandridge and Sedlitz possessed a "sufficiently culpable state of mind, rising above negligence or even gross negligence and being tantamount to intent to punish." *Broyles v. Corr. Med. Servs., Inc.*, 478 F. App'x 971, 975 (6th Cir. 2012) (citing *Horn v. Madison Cnty. Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994)). Further, Plaintiff did not allege with specificity that the ODRC Defendants contaminated, served, or had prior ability to prevent the food from being served or consumed. (ECF No. 111 at 13). As to Plaintiff's assertion that the ODRC Defendants should be liable for aiding and abetting, such claims do not fall under the Eighth Amendment. As outlined above, Plaintiff must demonstrate that he was subjected to substantial risk of serious harm under the

8

objective prong, and that the ODRC employees acted with a knowing disregard as required under the subjective prong. *See Farmer*, 511 U.S. at 837.

Even if this Court were to accept there was a substantial risk of harm to Plaintiff, applying the same logic above that this Court applied above to Ms. Woods, this Court finds that the isolated incident of contaminated food served as it applies to the ODRC Defendants fails to establish the objective prong. Unlike Ms. Woods, the ODRC officers were not personally involved or sufficiently aware of the intentional contamination of Plaintiff's food that this Court acknowledged may be serious enough to overcome the isolated incident standard. The ODRC officers' conduct is more analogous to the officer in *Mitchell* who was informed of intentional tampering by someone else and failed to act. *Mitchell*, 2011 WL 1458309, at *3–4. ("As discussed above, however, a single incident of food poisoning as a result of prison negligence does not create a constitutional claim. Plaintiffs must provide evidence that prison officials demonstrated knowing disregard of a substantial risk of serious harm to the inmates. Plaintiffs have provided almost no evidence of knowing disregard."). Here, Plaintiff fails to demonstrate that this isolated incident satisfies the objective prong as to the ODRC Defendants and that they were deliberately indifferent to a substantial risk of harm.

Plaintiff has failed to state an Eighth Amendment claim with respect to the ODRC Defendants allowing the food to be served. As such, Plaintiff's Motion to Alter Judgment is **DENIED**.

> 2. *Eighth Amendment Claim – Delayed or Denied Medical Treatment*

Plaintiff asserts that this Court should alter its judgment dismissing the ODRC Defendants for delayed medical treatment, as this Court failed to consider the wanton infliction of pain on Plaintiff by medical department Defendants and correctional staff. (*See generally* ECF

9

No. 113 at 7–18). This Court finds that Plaintiff has not presented any evidence causing it to depart from its Opinion & Order finding that Plaintiff fails to plead a "sufficiently serious" medical need to satisfy the objective prong. (*See generally* ECF No. 111 at 15–17).

In order to state a claim, a plaintiff must satisfy the objective and subjective components. The objective component considers whether there is "a sufficiently serious medical need." *Baynes v. Cleland*, 799 F.3d 600, 618 (6th Cir. 2015). To satisfy the subjective component, the plaintiff must show the act was with deliberate indifference. *Baynes*, 799 F.3d 600, 618 (6th Cir. 2015) (quoting *McCarthy v. Place*, 313 Fed. App'x. 810, 814 (6th Cir. 2008)).

In Plaintiff's Motion to Alter Judgment, Plaintiff primarily focuses on the subjective component and asserts knowledge and deliberate indifference on behalf of the ODRC Defendants. (*See generally* ECF No. 113 at 7–18). Plaintiff spends very little time arguing why the alleged gastrointestinal issues constitute a serious medical need. Courts "are reluctant to find that gastrointestinal symptoms alone may constitute a sufficiently serious medical need." *Rains v. Wellman*, 2022 WL 18587783, at *7 (W.D. Mich. Dec. 30, 2022), *report and recommendation adopted*, 2023 WL 543075 (W.D. Mich. Jan. 27, 2023) (citing *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009)).

Additionally, Plaintiff alleges he repeatedly informed ODRC employees of his worsening symptoms which included an upset stomach, cramps, abnormal bowel movements, and vomiting prior to December 5, 2021. (ECF No. 113 at 12–13). Plaintiff cites specifically that Defendant Kearns and other ODRC Defendants were informed of his requests to be seen by the medical staff, but did not permit him to do so. (*Id.* at 22). This Court, however, holds to its conclusions that "disagreement with a course of medical treatment does not rise to the level of a federal constitutional claim under the Eighth Amendment" and that Plaintiff's claims are "more properly

characterized as a disagreement as to whether his condition required treatment." *Rhinehart v. Scutt*, 894 F.3d 721, 744 (6th Cir. 2018); (ECF No. 102 at 23). Thus, this Court maintains that any delay in treatment can be attributed to the fact that an upset stomach alone would not make a lay person recognize the necessity of medical attention. (ECF No. 93 at 16). Further, after evaluating Plaintiff, the medical staff did not deem Plaintiff's symptoms as requiring further medical attention. (ECF No. 31, ¶ 90). Because Plaintiff's allegations do not suggest facts that would meet the objective prong, this Court does not find it necessary to evaluate the subjective prong further. As such, Plaintiff's Motion to Alter Judgment with respect to the ODRC Defendants denying or delaying medical treatment is **DENIED**.

### 3. First Amendment Retaliation

Plaintiff asserts this Court overlooked that various state Defendants retaliated against him for requesting medical attention. (ECF No. 113 at 19). To state a First Amendment Claim, Plaintiff must establish three elements: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). This Court previously found that Plaintiff failed to allege his reports directly resulted in him being placed on quarantine. (ECF No. 111 at 20–21).

In the March 14, 2025, Order, this Court held that "[Tatman's] threats may be sufficient to state a claim if Plaintiff alleged sending any medical requests before December 5, 2021." (*Id.* at 20). Upon further review, this Court finds that Plaintiff sufficiently alleges the elements of a First Amendment retaliation claim. Plaintiff asserts that he made his first medical complaint on December 2, 2021, before the threats or alleged retaliation occurred. (ECF No. 113 at 12).

11

Plaintiff, however, does not explicitly allege that his medical complaints began on December 2, 2021, in the second amended complaint. Even so, Defendants do not contest the December 2, 2021, timeline. (ECF No. 114 at 9-10).

Further, Plaintiff makes various references to submitting medical health forms and asserts that the medical staff provided the ODRC staff with a list of all individuals who desired to be seen by medical staff. (ECF No. 16, ¶¶ 56, 58, 62). Plaintiff asserts that ODRC staff used this list to determine who would be permitted out of their cells on the morning of December 5, 2021. At 6:30 a.m. on December 5, 2021, Plaintiff alleges that he and other inmates who had sought medical attention were informed they were not allowed out of their cells until they were spoken to by the "White Shirt[,]" whereas other inmates were permitted out of their cells per usual. (*Id.* ¶ 61). Logic follows that Plaintiff had to have made a request for medical attention prior to December 5, 2021, to be included on the list he discusses. Further, regardless of any unclear timeline, this Court reasons that Lt. Tatman's alleged statements make explicit that Plaintiff alleges he made medical complaints prior to December 5, 2021. At 6:45 a.m. on December 5, 2021, it is alleged that Defendant Lt. Tatman made explicit threats stating, "I've seen what each of you mother-fuckers wrote to medical … [i]f you go to medical your ass is locked the fuck down." (*Id.* ¶¶ 66, 68). Further, Lt. Tatman allegedly stated "I'm locking the entire Unit down, because, we fired the bitch what else do you want us to do?" (*Id.* ¶ 65).

Additionally, it is not disputed that on December 2, 2021, Plaintiff made a complaint about his medical concerns through the Informal Complaint Reference Process ("ICR"). (ECF No. 31 ¶ 51). In response, Plaintiff was informed that he needed to submit a Health Service Request form to address any medical needs. (*Id.*). Plaintiff subsequently alleges that after sending in an ICR request, he followed Defendant Deputy Warden Robert Welch's instruction to

contact medical staff even though he had already sent in his first request to be seen. (*Id.* ¶ 56). As such, Plaintiff filed another "Health Service" request form explaining his symptoms and he specifically indicated that he believed he had been poisoned. (*Id.*). When considering whether a pro se litigant has effectively stated a claim, the Sixth Circuit has instructed that courts give indulgent treatment to inartfully pleaded allegations. *Hill v. Lappin*, 630 F.3d 468, 471 (6th Cir. 2010). Thus, construed liberally, this Court finds that Plaintiff has alleged that his requests for medical attention began on December 2, 2021, or at least sometime before December 5, 2021.

Further, contrary to the Defendant's assertions, Tatman's conduct amounts to more than "being yelled at" or "mere threats." (ECF No. 114 at 9). This Court finds that the conduct could be construed as meant to intimidate and deter further reporting as was made explicit by Defendant Tatman's invective. (*See* ECF Nos. 31 ¶¶ 65–68). Moreover, even prior to the explicit threats by Tatman, Plaintiff demonstrates that he and others who reported illness to medical staff were not allowed to leave their cells prior to being addressed by a Lieutenant. (ECF No. 31, ¶ 61). Plaintiff alleges those who requested medical attention faced direct consequences, while those who did not seek medical attention "after the threats by Defendant Lt. Tim Tatman, were not placed on quarantine status nor punished in any way." (*Id.* ¶ 83). Such allegations support that the lockdown was plausibly due to Defendant Lt. Tatman following through on his threats. Further, Plaintiff's allegations demonstrate that Lt. Tatman was allegedly motivated by Plaintiff engaging in protected activities.

With respect to Defendants David Agee and Isaac Bullock, however, this Court reaffirms its conclusion that Plaintiff failed to allege sufficiently particular facts to support a finding of First Amendment Retaliation. Plaintiff alleges that Defendant Bullock restricted his access to the kiosks where he could make informal complaints. (ECF No. 31, ¶ 115). Plaintiff, however, fails

13

to demonstrate with sufficient particularity that Bullock restricted kiosk access or that his alleged conduct was related to Plaintiff's protected activity. Similarly, Plaintiff fails to allege non-conclusory statements that prove Defendant Agee retaliated against Plaintiff by sending Defendant Tatman to speak to Plaintiff. (ECF No. 31, ¶ 64). Plaintiff makes no specific assertions that Agee instructed Tatman to threaten or to retaliate against the inmates. As such, Plaintiff's Motion to Alter Judgment on First Amendment Retaliation as it pertains to Defendants Agee and Bullock is **DENIED**, but **GRANTED** as to Lt. Tatman.

### 4. Failure to Train

Plaintiff states this Court has overlooked that Plaintiff, to support his failure to train claims, presented Defendant David Agee as a supervisory official. (ECF No. 113 at 20). "[T]o succeed on a supervisory liability claim, [a plaintiff] must show that 'a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate.'" *Crawford v. Tilley*, 15 F.4th 752, 761 (6th Cir. 2021) (quoting *Garza v. Lansing Sch. Dist.*, 972 F.3d 853, 865 (6th Cir. 2020)). A plaintiff must plausibly allege that a supervisory defendant "authorized, approved, or knowingly acquiesced in the unconstitutional conduct ... of his subordinates through the execution of his job functions." *Peatross v. City of Memphis*, 818 F.3d 233, 242 (6th Cir. 2016). Even in pointing to Defendant Agee, this Court reaffirms its prior conclusion that Plaintiff failed to state a claim. Plaintiff fails to assert with particularity what Defendant Agee allegedly did or failed to do. (ECF No. 111 at 22). As discussed above, Plaintiff makes no specific assertions regarding orders given by Agee to Tatman instructing him to retaliate against Plaintiff and other inmates. Plaintiff's allegations are conclusory, formulaic recitations of elements for constitutional violations and do not suggest

causal connections to any constitutional violations. Hence, Plaintiff's Motion to Alter Judgment with respect to his Failure to Train Claim is **DENIED**.

### 5. Equal Protection

Plaintiff argues that this Court has overlooked that he had been intentionally treated differently than other inmates. (ECF No. 113 at 21). To state a class-of-one equal protection claim, Plaintiff must show he or she has been "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Davis v. Prison Health Servs.*, 679 F.3d 433, 441 (6th Cir. 2012) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). This Court previously held that there was an identifiable rational basis for the difference in treatment between the inmates who sought medical attention versus those who did not. Specifically, that quarantining those who claim being sick enough to seek medical care is a rational basis for the difference in treatment. (ECF No. 111 at 23). This Court now reconsiders its prior conclusion and finds that Plaintiff demonstrates that the staff did not separate all inmates who sought medical attention, indicating an alternative basis for the staff's actions.

Importantly, Plaintiff pled that medical staff provided the lieutenants a list of names of the inmates who reported illness. (ECF No. 31, ¶ 62). Thus, prior to any inmates being seen by medical staff, the prison staff had knowledge of who specifically had made reports. Plaintiff further highlights that prior to being seen by the medical staff, he and various others who had reported illness were already locked down, and following Tatman's threats, those who did not continue seeking medical attention were "released from lockdown." (ECF No. 113 at 21). In comparison, after being seen by medical staff, Plaintiff asserts he was placed on a "sham

15

[medical] quarantine" by Doctors Harlan and Corbett who were aware that Plaintiff was already locked down. (*Id.*).

Upon further review, this Court finds that there was a difference in treatment between those who sought further medical treatment after Lt. Tatman's threats, and those who did not. Plaintiff alleges that the "sham [medical] quarantine" was a coverup coordinated between prison staff and medical staff to disguise their retaliation (further lock down) against Plaintiff for seeking medical treatment. (*Id.*; *see* ECF No. 31, ¶¶ 75, 81, 83). Specifically, Plaintiff contests the "medical quarantine" was not based on medical reasoning. (ECF No. 113 at 21–22) ("The Health Care Administrated acknowledged in response to a kite that she was aware that the inmates did not have COVID they were being locked down due to an incident in the Chow hall."). Plaintiff pled further evidence of this cover up by attesting that "Plaintiff with the other inmates were placed on lockdown [and] treated like they had COVID-19, for staff to justify locking them down, even though no one was tested for COVID-l9 by Medical nor had any COVID- 19 related symptoms." (ECF No. 31, ¶ 81). Plaintiff contends that some ODRC staff, like Defendant David Agee, cited COVID-19 as reasoning for the lock down, while other staff members asserted to Plaintiff that "[n]obody says you all have COVID- 19." (*Id*. ¶¶ 79, 101). Such inconsistencies cast doubt on the rationale behind why Plaintiff was subjected to lock down.

In sum, Plaintiff argues that he was locked down for seeking medical treatment prior to being seen by medical, and remained locked down, under the guise of a medical quarantine, after he followed through on seeking medical attention. As such, Plaintiff sufficiently alleges that he was in a "sham [medical] quarantine" after being seen by medical staff because he did not acquiesce to Tatman's invective to inmates not to request medical treatment.

16

Plaintiff has alleged through his pleadings that ODRC staff treated those who chose to be seen by medical staff following Lt. Tatman's threats differently than those who declined. Specifically, Plaintiff contends that the lock down was not merely due to Plaintiff and others being sick but was rather used as a form of punishment. The motive for the disparate treatment is demonstrated by Tatman yelling "I've seen what each of you mother-fuckers wrote to medical … [i]f you go to medical your ass is locked the fuck down." (ECF No. 31, ¶ 66, 68). This Court finds that Plaintiff has demonstrated, specifically through the threats made by Tatman, and other inconsistent statements made by ODRC staff, that there was not a rational basis for the difference in treatment. *See, e.g.*, *Olech*, 528 U.S. at 565 (finding plaintiff properly alleged lack of a rational basis where a village "demanded a 33–foot easement as a condition of connecting her property to the municipal water supply [but] the Village required only a 15–foot easement from other similarly situated property owners."). Given the various inconsistencies, the rationale that the ODRC Defendants sought to separate those who were sick from those who were not "overcome[s] the legal presumption of rationality and demonstrate[s] the lack of a rational basis for the Defendants' acts." *Bower v. Village of Mt. Sterling*, 44 Fed. App'x. 670, 678 (6th Cir. 2002).

This is further supported by the affidavits of Douglas Thompson and Jeromy Johnson, who both reported illnesses, but did not seek their previously requested medical treatment after the threats by Tatman. Neither man was subjected to further lock down or a medical quarantine, despite the ODRC staff being aware of everyone who had reported illness. (ECF No. 31 at Exhibits 3A, 3B).

This Court finds that Plaintiff's allegations make the rationale that ODRC staff wanted to separate those who were ill from those were not seem irrational. If that were the case, it would be

17

reasonable to subject all individuals who had reported symptoms, at any stage, to a continued medical quarantine or lock down. Further, it would be unlikely for there to be so many conflicting rationales from staff about the reasoning for the lock down. It is more conceivable that the distinction of the separation here was not whether the inmates were sick enough, but rather which inmates dared still to seek care for their illness following the alleged threats. As such, Plaintiff's Motion to Alter Judgment with respect to his Equal Protection Claim is **GRANTED**.

### IV. CONCLUSION

For the reasons set forth above, Plaintiff's Motion to Amend Judgment as to the First Amendment Retaliation Claim as it pertains to Defendant Lt. Tatman, and the Equal Protection Claim is **GRANTED**. Plaintiff's Motion to Amend Judgment as to all other claims is **DENIED**.

**IT IS SO ORDERED.**

_____
**ALGENON L. MARBLEY
UNITED STATES DISTRICT JUDGE**

**DATED: November 21, 2025**